UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-26-P-S |
| | ) | |
| BOUNKET THONGSAPHAPORN, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Bounket Thongsaphaporn, charged with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of a substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; two counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1); and one count of possession with intent to distribute a substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), seeks to suppress statements made after his arrest that he asserts were elicited in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Indictment (Docket No. 17); Defendants' [sic] Motion to Suppress, etc. ("Motion") (Docket No. 25) at 1. An evidentiary hearing was held before me on August 10, 2005 at which the defendant appeared with counsel. The government called three witnesses and offered three exhibits, which were admitted without objection. The defendant called two witnesses, including himself, and offered no exhibits. Counsel argued orally, and briefly, at the end of the hearing. Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

1

## I. Proposed Findings of Fact

Counsel stipulated at the outset of the evidentiary hearing that on March 25, 2005, when the defendant made the post-arrest statements that are at issue, he was properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), in his native language, on both occasions when the warnings were given.

On March 25, 2005 the defendant was arrested in Brunswick, Maine. He was taken to an interview room in the basement of the Brunswick police department building. Reginald Walker, a detective with the Knox County Sheriff's Department and a special agent with the Maine Drug Enforcement Agency, Katherine Barnard, a special agent with the U. S. Drug Enforcement Agency, and Jonathan Richards, an agent with the Maine Drug Enforcement Agency who had arrested the defendant, were in the interview room with the defendant.[1] Richards asked the defendant where he was from and what his native language was. The defendant told the agents that he could speak English but that his native language was Laotian. He was asked no other questions before he was read his *Miranda* rights.

Barnard read the defendant his *Miranda* rights through a Laotian language interpreter who had been contacted by telephone. After the reading was completed, the agents told the defendant that they had evidence of him distributing drugs. The defendant indicated that he did not want to talk with the agents.[2] Barnard and Richards then left the room[3] to talk about what they would do next. While out of the room, Barnard called the United States Attorney's office about preparing an affidavit to submit in support of a request for a warrant to search the defendant's residence. Walker was seated three to five

---

[1] According to the defendant, another agent named Tully was also in the interview room. He testified that Tully left the room with Barnard and Richards. I do not credit any of the defendant's testimony that I recount herein in footnotes.

[2] According to the defendant, he asked for an attorney at this time.

[3] According to the defendant, before she left the room, Barnard told him "I have your fingerprints and I will put one kilo on you and get you 30 years in jail."

feet away from the defendant at the table in the interview room.[4] After approximately five minutes during which neither he nor Walker said anything, the defendant said that he was thirsty and asked for water. Walker asked someone to get something for the defendant to drink and he was provided with one or two cans of Coca Cola. Either before or after the beverage was provided, the defendant asked Walker what was going on. Walker replied that the defendant knew why he was in the position he was in. The defendant replied that the agents wanted him to help them get "the big guy."

Walker then told the defendant that the agents would like to talk to him but that he had refused to answer questions and that the defendant could answer some questions and refuse to answer others.[5] The defendant then said that he was willing to talk. Walker summoned Barnard and Richards back into the room, telling them that the defendant had decided to answer questions. When she entered the room, Barnard asked the defendant whether he wanted to speak with them, and he said that he did. She then called the interpreter and repeated the *Miranda* rights and warnings, with translation provided by the interpreter. The defendant stated that he understood his rights and wanted to waive them and speak to the agents. He said that he would speak to the agents without a translator and would tell them if he was having difficulty in speaking or understanding so that they could contact the interpreter again. Barnard and Richards left the room after the defendant had responded to requests for basic information.[6] Richards went back into the interview room after Barnard told him that she was going to the United States Attorney's office in Portland and stayed through the remainder of Walker's interview with the defendant.

---

[4] The defendant testified that Walker was "in [the defendant's face]" throughout the time that both were in the interview room.

[5] According to the defendant, Walker also said at this time that "all of the government people [are] here to help you. If you cooperated they can give you a low sentence." Transcript of Proceedings ("Tr.") at 48. Walker denied making this statement. The defendant testified that he then said, "[I]f you want me to cooperate today, don't put me in jail. If you put me in jail today, the guy [is] going to know. I'm not going to be safe," and that Walker replied, "[O]kay, we [will] let you go." *Id*. at 51.

[6] The defendant testified that Richards remained in the room throughout Walker's questioning of the defendant.

3

In response to questions from Walker, the defendant stated that he had cocaine at his house, specifically nine or ten ounces in his truck and two ounces in the freezer. He told Walker that he had $9,000 cash at one location in the house and another $1,000 or $1,500 at a second location in the house. He told Walker that his source for cocaine was a Puerto Rican man named Tony from Andover, Massachusetts, that he would call Tony on a cell phone and tell him what he needed and that Tony would tell him where and when to meet. He said that the last time he obtained cocaine from Tony was about three months earlier, when he bought one kilo. He identified a woman involved in cocaine trafficking from a photograph that Walker showed him. He said that he had sold 30 ounces of cocaine to a woman named Mary Gargan sometime around the previous Christmas. He said that he had not sold cocaine to anyone other than Gargan. All of this information was obtained after the *Miranda* rights and warnings had been read to the defendant for a second time.[7] The interview lasted between 30 and 45 minutes.

While she was driving to Portland and again after she had arrived at the office of the United States Attorney in Portland, Barnard spoke with Walker and Richards over the telephone. During those conversations, Barnard was told what the defendant had said.[8] After the interview was completed, the defendant was driven to the Portland office of the U. S. Drug Enforcement Agency; Richards and Walker were in the car with the defendant.[9] At that office the defendant was fingerprinted and asked whether he had a girlfriend. He was then taken to the Cumberland County Jail.

---

[7] The defendant testified that he gave all of this information to Walker before Barnard re-entered the room and went through a second *Miranda* reading. He said that after the second reading, Barnard asked the defendant where he got the drugs and who he was dealing with. The defendant testified that he then said, "Mary Ann." According to the defendant, Walker then told Barnard, "I already got all the information from [the defendant]."

[8] The defendant testified that Walker made these telephone calls during his interview of the defendant, which he testified came before Barnard read him the *Miranda* rights and warnings a second time.

[9] According to the defendant, Walker asked him during the drive to Portland whether there was more than 12 ounces of cocaine in his house and what happened to the rest of the kilo. He testified that he responded that he had smoked the rest of it. He testified that another officer asked him during the drive how much he paid for the kilo and he responded that he had paid $27,000.

4

At the United States Attorney's office, Barnard helped prepare an affidavit that included the information she had received over the telephone. She then went to the federal courthouse to apply for a search warrant for the defendant's house, which was granted at 3:41 p.m.

## Discussion

The defendant contends that the statements he made in the interview room in Brunswick and in the car during the ride from Brunswick to Portland were obtained in violation of his right against self-incrimination under the Fifth Amendment, his right to counsel under the Sixth Amendment and his right to due process of law under the Fourteenth Amendment. Motion at 1.

To the extent that counsel for the defendant means to argue that the defendant's inculpatory statements were coerced[10] by her citation of that portion of the opinion in *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991), dealing with coercion, Motion at 2, the only possible evidence of coercion offered by the defendant at the hearing was the agents' statement to the defendant that they had evidence of his dealing drugs; Barnard's alleged threat when she left the interview room the first time, *see* footnote 3, *supra*; Walker's alleged statement that the defendant would be released if he cooperated; and the defendant's testimony that Walker was "in [his] face" throughout the time the two were in the interview room. Barnard denied making the possibly threatening statement; Walker denied promising the defendant leniency. I credit their testimony and find the defendant's testimony to be lacking in credibility on all three points. In addition, I doubt that mere physical proximity of the questioner, standing alone, is sufficient to establish coercion in any event. Finally, a statement to the defendant that the police have evidence against him is not coercive. *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998); *see also United States v. Palmer*, 203 F.3d 55, 62 (1st Cir. 2000) (intentional lie to defendant about his co-conspirator not coercive).

---

[10] This is the only argument in the defendant's motion, if indeed it can be said that it is made and developed enough to be considered by
(*continued on next page*)

The admissibility of statements made after a defendant has invoked his right to remain silent "depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Volunteered statements made by a defendant without benefit of counsel after he has invoked his right to counsel may also be admissible if the defendant initiates the conversation in which the statements are made. *Edwards v. Arizona*, 451 U.S. 477, 485-86 (1981). This is particularly true in situations in which the defendant has been again made aware of his *Miranda* rights after having initiated further contact. *See generally Oregon v. Bradshaw*, 462 U.S. 1039, 1041-45 (1983) (plurality opinion). In this case, the defendant does not contend that his waiver of his *Miranda* rights after the second warning was given was not knowing and intelligent. He contends that he did not initiate further contact with Walker as that term is used in *Edwards*, so that all further statements he made, regardless of when the second *Miranda* warning was given, were inadmissible. Motion at 3. After the defendant has invoked his right to counsel following a *Miranda* warning, he must have initiated further contact and waived the right to counsel in order for subsequent statements made in the absence of counsel to be admissible. *Bradshaw*, 462 U.S. at 1045.

By asking "[W]hat is going to happen to me now?", a defendant initiates further contact within the holding in *Edwards*. *Id*. at 1045. When the defendant in *Bradshaw* approached the police and initiated further conduct by asking this question, the police gave him a second *Miranda* warning before any questions were asked. *Id*. at 1042. Because the defendant thereafter signed a written waiver, the police made no threats, promises or inducements, and the defendant understood his rights, the waiver of his right to counsel also took place. *Id*. at 1042, 1046. As was the case here, where the defendant initiated contact by asking Walker what was going on, the police officer in *Bradshaw* responded to the defendant's question "[W]hat is going to happen to me now?" by saying "You do not have to talk to

---

this court, that implicates the Fourteenth Amendment.

6

me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say — because — since you have requested an attorney, you know, it has to be at your own free will." *Id*. at 1042. The officer also suggested that the defendant might help himself by taking a polygraph test. *Id*. Here, Walker told the defendant that the defendant knew why he was in the position that he was in, that the officers would like to talk to him but that he had refused to answer questions and that he could answer some questions and refuse to answer others. Neither Walker nor any other officer made any threats, promises or inducements in order to convince the defendant to change his mind. The defendant does not contend that he did not understand his rights. Given the totality of the circumstances, *see Colorado v. Connelly*, 479 U.S. 157, 176 (1986); *United States v. Ferrer-Cruz*, 899 F.2d 135, 141 (1st Cir. 1990), no violation of the defendant's Fifth or Sixth Amendment rights occurred in this case. *United States v. Fontana*, 948 F.2d 796, 806-07 (1st Cir. 1991).

### Conclusion

For the foregoing reasons, I recommend that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 16th day of August, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge